1
2
3
4
5

DANIEL T. DORIA, APPEARING PRO SE
16260 N 71ST ST STE 450
SCOTTSDALE, AZ 85254
TELEPHONE: 702.279.5326
E-MAIL: DTDORIA85@GMAIL.COM
DANIELDORIA105@YAHOO.COM

6
7
8
9
10
11

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

12
13
14
15
16
17
18
19
20
21

DANIEL T. DORIA, *an individual*

Plaintiff,

v.

SUNRUN INC.,

Defendant

Case No. 2:19-cv-05643-DJH

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF APPLICATION FOR TEMPORARY RESTRAINING ORDER AND REQUEST FOR OSC RE PRELIMINARY INJUNCTION**

22
23
24
25
26
27
28

1

`

## **TABLE OF CONTENTS**

2

3   I.    INTRODUCTION..........................................................................1,2

4   II.   STATEMENTS OF MATERIAL FACTS..................................2-8

5        A.   Parties...............................................................................2

6        B.   Sunrun's Fraudulent Inducement and Unjust Enrichment.....................2

7        C.   Sunrun's Breach of Implied Contracts(s)............................................2-4

8
    D.   Sunrun's Rejection of Accommodation and Attempting to
9        Leverage Past Accommodations for Performance in Violation
         of the ADA..........................................................................4,5
10
    E.   Sunrun's Discrimination by Disparate Impact in Violation of
11       The ACRA...........................................................................7,8

12
    F.   Sunrun's Illegal Disclosure of Confidential Medical Data In Violation of
13       the ADA.............................................................................8

14
15  III.  ARGUMENT

16      A. Legal Standard..................................................................9

17      B. A TRO Is Needed and Just, to Prevent Further Fraudulent
18         Representations About Company Conditions.......................................9-12

19      C. A TRO Is Needed and Just, to Prevent Sunrun From
20         Further Instructing Employees to Violate the Law in
           Violation of our Implied Contracts........................................12,13
21
22      D. A TRO Is Needed and Just, to Prevent Sunrun From Further
           Discriminating in Violation of the ADA.................................13,14
23
24      E. A TRO is Needed and Just, to Prevent Sunrun's Ongoing
           Discrimination Through Disparate Impact, In Violation
25         of the ACRA..........................................................................14,15

26

27

28

`

F.  A TRO is Needed and Just, to Prevent Sunrun's Ongoing
     Disclosure of ADA Protected Confidential Private
     Medical Information to Inappropriate Internal
     Company Workers or For Legally Improper Circumstances................15,16

G. The Harm to be Sustained Should a TRO Not Be
     Granted Is Certainly Imminent and Irreparable....................................16-18

H. No Bond Should Be Required.....................................................................18

IV.   CONCLUSION................................................................................................18

1

# TABLE OF AUTHORITIES

2

**Cases**

3

*California v. Tahoe Regional Planning Agency,*

4
  766 F.2d 1319, 1326 (9th Cir. 1985)................................................................18

5

*Civil Rights Div. v. Amphitheater Unified Sch. Dist.*

6
  No. 10, 680 P.2d 517, 519 (Ariz. Ct. App. 1983).......................................14,15

7

*Green v. Lisa Frank, Inc.,*

8
  221 Ariz. 138, 155-56 ¶ 53, 211 P.3d 16, 33-34 (App. 2009)........................10

9

*Griggs v. Duke Power Co.,*

10
  401 U.S. 424, 429-30 (1971)..........................................................................14

11

*Jorgansen v. Cassiday,*

12
  *320 F.3d 906, 919 (9th Cir. 2003)*..................................................................18

13

*Melendres v. Arpaio,*

14
  695 F.3d 990, 1002 (9th Cir. 2012)................................................................16

15

*Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental Inc.,*

16
  944 F.2d 597, *603 (9th Cir. 1991)*................................................................16

17

*Stormans, Inc. v. Selecky,*

18
  586 F.3d 1109, 1127 (9th Cir. 2009)................................................................9

19

*Taeger v. Catholic Family & Cmty. Servs.,*

20
  196 Ariz. 285, 294 ¶ 28, 995 P.2d 721, 730 (App. 1999)..............................10

21

22

23

24

25

26

**Statutes, Regulations and Rules**

27

Federal Rules of Civil Procedure

28

`

Rule 65(a)(b)(c)(d)...........................................................................................10

Arizona Rules of Civil Procedure
Rule 9(b)................................................................................................9,10

42 U.S. C. Americans With Disabilities Act of 1990
§12111(b)(2)..........................................................................................13,14
§ 2000e-2(k)..............................................................................................14

Arizona Civil Rights Act of 1990
Chapter 15 Section 19................................................................................14

U.S. CFR 29
§1630.14(b)(1).........................................................................................15
§1630.14(c)(1)(i)......................................................................................15

`

1

## I.  INTRODUCTION

2     I the Plaintiff, Daniel Thomas Doria, am a 33-year-old American
3  businessperson.  I have worked in America's public sector since 2002 at the age of
4  sixteen.    During the recruitment process, Sunrun made multiple fraudulent
5  misrepresentations about the pay potential, company operational integrity, systems
6  used or not used to punish salespeople, and false elements of the role that led to an
7  unnecessary relocation.  These fraudulent misrepresentations led to immense financial
8  and unacceptable emotional harm, and ongoing misrepresentations like in nature, will
9  certainly continue to lead to additional irreparable harm.  When I properly requested a
10 medical accommodation under the ADA, Sunrun improperly denied the request on
11 two improper grounds, which cause disparate impact to individuals suffering from the
12 conditions that I do.    After reporting grievances to management regarding the
13 misrepresentations made in the interview, and treatment I received from management,
14 Sunrun began to retaliate against me by removing me from our team's sole source of
15 group communication, Google Chat, and threaten removal of my medical
16 accommodation.  During the process, Geena Holeman, HR for Sunrun, shared my
17 confidential information with co-workers which was protected by the ADA at the
18 time. Management went on to spread disparaging information to employees about me
19 and the reason I was removed.  After extending three possible resolutions to Sunrun, it
20 responded by offering a three-month severance to part ways and threatened to fire me
21 if I didn't accept it.I received a written communication from a teammate asking me
22 why I'd been removed from the team though I wasn't aware, and a report from the
23 same teammate that management informed our team that I was removed because I
24 don't get along well with others.

25     I have spent eighteen years in business, refining my ability to interpret
26 product value propositions, financial value for clients, and the science between sales
27 and client relationships.  The industry of sales is inherently a high turnover industry

28

wherein integrous employers and product offerings are widely sought by those who take issue with harming clients.  I relied on Sunrun's verbal and written commitments of the type of operation and pay that are achievable at Sunrun.  The false claims made by Sunrun, and its retaliatory behavior have and will continue to cause me and the consuming public, great harm.

## II. STATEMENT OF MATERIAL FACTS

### A.    Parties

I the Plaintiff, I have been in sales and sales management in the public sector since 2002, providing exceptional performance and service in support of my employers.  My primary responsibilities for Sunrun were managing the transport, sale, coordination, fulfillment and overall execution of Sunrun's workers, merchandise, and services in and through 22 United States and the District of Columbia, as it relates to my personal clients.

Sunrun Inc., is a publicly traded sales organization company, incorporated in Delaware, and headquartered in San Francisco, CA.  It distributes 10, 20, and 25-year financial instruments in the form of leases, loans, and warranties with or without production guarantees, associated with its tangible product offering, being solar panels.

### B.    Sunrun's Fraudulent Inducement and Unjust Enrichment

Sunrun is in a position of power as an employer, to make representations during job interviews about specific material elements of the role to entice talent to work for the company.  Sunrun misrepresented that I needed to move to Scottsdale Arizona in order to receive company leads.  I did not.  Sunrun stated with certainty, that the company does not use a call queue system that systematically starves consultants for leads based on its face, on previous short-term sales performance.  Sunrun does do this, the system is called 'knock out', and managers

refer to the resulting career path internally as 'The Death Spiral'.  Sunrun willfully concealed this fact, stating the opposite, that Sunrun has a system to provide an abundance of leads, if your sales are exceptional.

Sunrun represented that the potential for income based on specific calculations we discussed, was in the range of $130,000 and $145,000 annually, when in fact, the true figures are approximately one third of that. Sunrun concealed this true measurable element of the business, in part by including Aaron Tong, a purported inside sales rep, on the inside sales team, to give the appearance of performance, and relying on his performance, and his alone, as a financial expectation.

Aaron Tong is provided a myriad of tools that we were not, that enable his immense performance.  He is not, indeed, an inside sales consultant. Regardless, he is represented in interviews, and all company meetings, as the 'golden standard', when no one has the tools or client access that he has, not by a long shot. His very existence in our reporting, is an act of misrepresentation and concealment on the part of Sunrun.

As I stated to Sunrun in my interview, what has made me excel in my roles previously, is the ability to hear the top performers work, and then mimic, and incorporate their abilities into my own.  Aaron Tong, and only Aaron Tong's calls, are unviewable to all Sunrun sales consultants.  Sunrun committed during two of my three interviews, that I would have access to recorded calls from top performers immediately upon entry to the company.  This was false.  Sunrun, represents through public display, that when a salesperson initiates a sale through a client, the company often installs a system for those clients.  This is false.  For every 100 contracts Sunrun's inside sales team has signed by a customer to start a project, only approximately 30 of those projects, make it to installation, in large part, due to Sunrun's operational incompetence.

The solar industry has great potential, and access to an incredible amount of funds in the United States.  It is and may remain, a wonderful industry with budding financial potential for salespeople across the U.S., both employed and independent.  Nothing gold lasts forever, and these months and years are crucial to capitalize on for a salesperson, whilst the opportunity and margins are still here.  We need to earn and save, so that we aren't pounding pavement when we're hoping for retirement, and circumstances like this represent overwhelming setbacks to those plans.  Many of us are not 'educated', and don't have easy access to careers that support the lifestyle we try to maintain while chasing the American Sales Dream of true integrity.

Sunrun's reckless, and disrespectful means of enticing true professionals to their organization for what appears to be an average of five months, is evidence of how this corporation views the time value of its workers lives as a whole.  Its negligent and willful misrepresentations, and behavior indicating intent to continue on in this fashion, has given rise to this action.

### C. Sunrun's Breach of Implied Contract

Sunrun is a publicly traded company, controlling billions of institutional and consumer investment dollars.  Sunrun has agreed to be bound by the Code of Conduct contained in the SEIA or Solar Energy Industries Association.  While the law clearly prohibits the behaviors I've alleged, the SEIA also contains clear nuanced definitions, of what is proper and what is not proper, as it relates to the distribution of solar.

Employees are required to adopt an employment agreement, as well as an internal code of conduct, binding us to the terms of the SEIA as well.  Sunrun also implements an employee handbook, and a list of company values, to which we are to adhere.  These agreements prohibit us from performing illegal activity and activity that willfully causes harm to a client's financial position.  To be clear, we are prohibited through policy, from selling the way Sunrun instructs us to sell.

Sunrun's employees have a right to expect that Sunrun reflects the behavior it demands, as all Sunrun employees are bound by these agreements.  Put simply, Sunrun consultants have a right to expect through our agreements, that Sunrun will not intentionally cause or attempt to cause its workers to defraud the American people and cause them immense financial harm.  However, that's exactly what Sunrun has done.

During training and on an ongoing basis, the company causes or attempts to cause Sunrun's employees to make false statements about our financial products and contracts to clients, to the detriment often, of 20%-40% of the total investment lost over time or upfront, by the consumer.  For example, not all encompassing, Sunrun falsely claims that our systems over produce by 10%-15%, as well as have guarantees that provide for a 10%-15% over production, on top of the true guarantee.  We are told to include false figures in our billing calculations, so that our verbal savings quotes are inflated.  Honorable sales professionals are always looking for a valuable product to offer and an honest company to work for, as sales is very cyclical, even more so in modern day.

It takes years for educated and uneducated people alike, to become comfortable asking the right questions during an interview to avoid working in a toxic environment, or generally wasting their 'working years'.  As workers, we have the right to rely on specific, and material claims made about the condition of the company and the role, when specifically offered for consideration of employment, and in a forum designed for that purpose, such as a job interview.  The contracts and implied contracts between Sunrun and myself are enforceable, were violated when I was asked to break the law, and Sunrun continues to make false and damaging claims to workers and potential workers, about the condition of the company, and the role.  These behaviors, and the court's inherent power to grant injunctive relief against such behavior, give rise to this action.

### D. Sunrun's Rejection of Accommodation, And Attempt to Leverage Past Accommodations For Performance In Violation Of The ADA

I made the appropriate requests for accommodation through Sunrun's HR channel.  After making the request, Sunrun requested that I have my doctor fill out forms explaining why the accommodation would be appropriate for my condition.  My doctor completed the paperwork and I returned it to Sunrun.  Following the return of the required information, Sunrun attempted to deny the accommodation on the grounds that I must live in a home or apartment to perform remotely, and then, that hotel internet cannot be used to serve the remote role.  These reasons are disconnected and are not in Sunrun's written policies.  In fact, Sunrun's written policies state contrarily, that internet speeds are required to be 35kbps or higher, and most hotels function at around 5,000 or higher.  I was entitled to the accommodation.  I informed Sunrun that I believed I was.  On or about two days later, the accommodation was granted.

Approximately three weeks later, Brian Donoho, Regional Sales Manager for Sunrun, and my direct supervisor at the time, sent me a message stating that my performance "won't cut it for remote".  The medical accommodation of working remotely cannot be leveraged to achieve greater sales, in this circumstance.  My performance can of course still be managed by Sunrun.   On or about two weeks later, Brian Donoho communicated a similar but overt threat.  At that time, I asked Brian Donoho to cease any abusive or harassing communications, and to leave the accommodation out of the discussion.   Donoho proceeded to remove me from our sole team communication forum and inform co-workers that I don't get along well with others.

Pursuant to the Americans With Disabilities Act of 1990, I was entitled to the accommodation without retaliation, and to enjoy my right to that

1   accommodation without being made to suffer for it.  It is these behaviors and the

2   Americans with Disabilities Act that give rise to this cause of action.

3       **E. Sunrun's Discrimination Through Disparate Impact, In Violation**
            **of The ACRA**

4

5       It is well established that individuals who are regarded as

6   homeless, often suffer from some form of mental impairment, which includes without

7   limitation depression, anxiety, and ADHD.  This is to say, not having access to stable

8   housing for any number of indirect reasons, for those suffering from those conditions,

9   is calculably more prevalent than the norm.

10      At the time Sunrun fabricated the policy about not being able to

11  perform the role from a hotel or apartment, it was aware not only of my medical

12  accommodation, but the specifics of the condition, and how it affects my cognitive

13  abilities.  It was also aware that I had moved into a hotel when I left Paulden Arizona

14  to relocate, spent a large amount of my cash reserves doing it, and did not 'live in an

15  apartment or a home', before it attempted to impose its unwritten policies on me.

16      Despite this, Sunrun did fabricate a reason for rejection, being

17  effectively, that homeless people are not allowed to hold the role of remote sales for

18  Sunrun.  Rejecting this logic, I appealed to Sunrun, and it then fabricated a new reason

19  for rejection, being that 'hotel internet is too slow for VOIP'.  This is false, and it

20  must have known it was false, because the role of remote consultant specifically

21  requires speeds of 35Kbps, per the Sunrun website, whereas hotels typically sit around

22  2,000-6,000 per user.

23      It is these behaviors, the disparate impact to be caused should

24  Sunrun be allowed to impose these policies in the future, exclusion from opportunity

25  to earn gainful employment in America, and the Arizona Civil Rights Act that gives

26  rise to this cause of action.

27

28

1

### F.  Sunrun's Disclosure in Violation of The ADA

2          While Sunrun may have the right to request certain medical

3   information to substantiate a request for accommodation, it does not have the right to

4   disclose this information to individuals inside or outside the company, unless proper

5   legal cause exists.

6          Geena Holeman, HR for Sunrun, was privy to my medical

7   accommodation request, as she had participated in the fulfillment of the request.

8   Eshelle Young, Director of Talent and Employee Relations, was instructed by Sunrun

9   to address my concerns directly, before she handed them to Jessica O'Quinn.  When

10  transferring the file to Eshelle Young, Geena Holeman briefed her on the material

11  facts, and included details of my medical accommodation to Ms. Young.  Ms. Young

12  introduced herself to me by stating, "Geena told me a bit about what's going on, and

13  she filled me in on your medical accommodation, so yeah..."

14         Sunrun did not have the legal right to share my confidential

15  medical information with Ms. Young, and Ms. Holman, in her specific duties as HR,

16  should have known not to do this.  Ms. Holman possesses a Masters Degree in Human

17  Resources and Labor Relations, and should be trained on ADA.  Regardless, she did

18  share this information with Eshelle Young, who undoubtedly continued to pass it up

19  the line, all while, Sunrun continued to profess the serious nature with which they

20  regards such laws and concerns.

21         It is the alleged violation of the ADA, and the means in which

22  Sunrun chose to apply its knowledge of my conditions, that give rise to this cause of

23  action.

24

25

26

27

28

III. ARGUMENT

### A. Legal Standard

**FRCP 65(a) &(b)** grants this court authority to issue a restraining order and preliminary injunctive relief if the required elements are met. Here they have been met. "The proper legal standard for preliminary injunctive relief requires a party to demonstrate that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." ***Stormans, Inc. v. Selecky***, **586 F.3d 1109, 1127 (9th Cir. 2009).**

### B. A TRO Is Needed to Prevent Further Fraudulent Representations About Company Conditions

**Under Federal Rule of Civil Procedure 65**, a district court may issue a temporary restraining order ("TRO") to prevent "immediate and irreparable injury, loss, or damage to the movant." **Fed. R. Civ. P. 65(b), (d).**

In the State of Arizona "All allegations of fraud must state the circumstances constituting fraud with particularity. **Ariz. R. Civ. P. 9(b)**. While no "magic language" is required, a claimant must plead all the essential elements of fraud in the complaint. ***Green v. Lisa Frank, Inc.***, **221 Ariz. 138, 155-56 ¶ 53, 211 P.3d 16, 33-34 (App. 2009)**. A showing of actual fraud requires: "(1) a representation, (2) its falsity, (3) its materiality, (4) the speaker's knowledge of its falsity or ignorance of its truth, (5) the speaker's intent that the information should be acted upon by the hearer and in a manner reasonably contemplated, (6) the hearer's ignorance of the information's falsity, (7) the hearer's reliance on its truth, (8) the hearer's right to rely thereon, and (9) the hearer's consequent and proximate injury." ***Taeger v. Catholic Family & Cmty. Servs.***, **196 Ariz. 285, 294 ¶ 28, 995 P.2d 721, 730 (App. 1999).**

Here, Sunrun misrepresented that:

1) My role had a high likelihood of earning $130,000 to $145,000 per year with my level of experience and expertise, when in fact about one third of that income was a reality.

2) Sunrun did not at the time, operate a system that systematically deprives employees of access to clients for, on its face, previous sales performance, when in fact it did.

3) Aaron Tong was a peer, provided the same tools, and that he produces approximately what I projected as a professional coming into the company, when in fact, Aaron Tong has a slew of privileges, access and tools to aid him in producing volume that we don't have, and he is the only inside sales person producing even close to the volume we projected and agreed was achievable.

4) Remote sales employees don't receive the same access to leads that inside sales consultants do, when in fact, they do.

All of these elements were and still are, material in consideration for a position with Sunrun.  As it relates to items 1, 2, 3, and 4, it's not plausible that someone working for Sunrun directly, employed with the purpose of filling positions using value propositions for those positions pitched to candidates, didn't know that this system was operated.

If Ms. Yollins, the recruiter, was unaware of the fact that the system was so harmful, this would explain her claim to the alternative of a positive impact, opposed to a negative punishment.  However, this doesn't absolve Sunrun of the "ignorant to its truth" elements allowed for a claim of fraud and lends more weight to the possibility that Sunrun has selectively compartmentalized data provisions to its workers to purport plausible deniability in circumstances such as these.

Due to the nature of the interaction, being a two way job interview, it is implausible to believe that the representations made were not in an attempt to

cause me to rely on them, and consequently, enter our employment arrangement with each other, wherein Sunrun has profited greatly, and I have suffered incredible expense.  As the impressions made were proprietary to Sunrun's internal and confidential workings, it's not reasonable to believe that I could have known prior to entry to the company, how they functioned in these regards, in fact, my only industrial reference point was SolarCity, a former employer in solar.

I relied on these statements, entered into Sunrun's Employment Agreement, and subsequent agreements and addendums.

I had a legal right to rely on the responses of the recruiter and managers recruiting me, to gauge what my life and income potential would be at Sunrun.

Proximate to the behavior giving rise to this cause of action, I relocated from Paulden Arizona at great financial expense.  My monthly expenses in Paulden were approximately $950 per month, and in Scottsdale, my minimum monthly expenses are approximately $2,600 per month.  I was positioned in Paulden specifically to recover from a financial hit I'd taken previously in a separation.  This delayed recovery, and obligated me to far greater financial obligations, in the event I should lose my position with the company, and income grows sparse.  Specifically, I cannot store as much expendable income for 'a tough winter', if it isn't there to be stored.  The shift after moving and due to economics, led me to live in hotels and motels around the corporate office, which while at times enjoyable, is just as traumatic as you would expect, before you begin to make lemonade from the lemons.  My need for treatment has increased since these conflicts arose, as peace of mind that comes with certain levels of income over the poverty line, relieve incredible amounts of anxiety, depression, and restores the ability to focus, without as much aid of a chemical.  To be clear, like most animals, when I'm not forced to survive, triggering

anxiety and depression, but still placed under incredible pressure to perform, I do, and quite well.

### C. Injunctive Relief Is Needed to Prevent Sunrun From Further Discriminating In Violation of The ADA

The **Americans With Disabilities Act of 1990 42 U.S.C. § 12111(b)(2)**  provides that "...The term "qualified individual" means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.... if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job."  Based on this definition, I am a qualified individual. The Act, **§ Sec. (b)** provides further that "The term "reasonable accommodation" may include... job restructuring, part-time or modified work schedules, **reassignment to a vacant position**, **acquisition or modification of equipment or devices**, appropriate adjustment or modifications of examinations, training materials or **policies**, the provision of qualified readers or interpreters**, and other similar** accommodations for individuals with disabilities."  Here, placing me in the remote role without initially requiring I live in a home, an apartment, or have internet provided by a home or apartment, would have constituted proper compliance with the ADA, but their behavior did not.   Inherently, it is inappropriate and a further violation of the ADA, to then attempt to leverage the accommodation's continuance for increased performance, under threat of loss of accommodation.

Should Sunrun be allowed to continue to falsely deny bona fide ADA accommodation requests, I and my peers, will continue to sustain exclusion from certain work opportunities.   Based on evidence available and discoverable, there is a high likelihood of success on the merits of my claims.  The balance of equities tips in

favor of society and the injunction, because accommodations like the one requested

cost a company nothing, result in higher performance, and comply with American

laws that lead to diversity in the workplace.

### D. Relief is Needed to Prevent Sunrun's Ongoing Discrimination Through Disparate Impact, In Violation of the ACRA

The **Arizona Civil Rights Act Ch. 15 Sec. 15.19** provides that

"The disparate impact theory of discrimination is used to analyze employment

**practices that are facially neutral but result in unnecessary employment barriers**

**based on an impermissible classification**. *Griggs v. Duke Power Co*., 401 U.S. 424,

429-30 (1971); *Civil Rights Div. v. Amphitheater Unified Sch. Dist*. No. 10, 680 P.2d

517, 519 (Ariz. Ct. App. 1983). Under the disparate impact theory, the plaintiff need

not show intentional discrimination, but must show that the employment practice itself

has the effect of disproportionately excluding a protected group. See *Griggs*, 401 U.S.

at 429-30; *42 U.S.C. § 2000e-2(k)*.  Here, Sunrun first denied transfer to a remote role,

based on the grounds that I didn't have a home, or an apartment.  Second, Sunrun

attempted to deny based grounds that my internet was supplied by a hotel.  It did not

offer any solutions.  Sunrun was aware that I did not live in a home or apartment when

I made the request.  Even if it wasn't intentionally discriminating by using housing

and mobile internet as their exclusionary factor, the behavior certainly imparts

disparate impact on myself, and any other similarly situated with the same medical

conditions that I have.

Sunrun should not be permitted to discriminate based on

someone's housing status, or their source of internet, and non-job-related abilities or

attributes.  Witness testimony, circumstantial evidence, and other discoverable

evidence provide for a high likelihood of success on the merits of my claims.  Should

Sunrun continue this and or other forms of disparate impact permitted in its policies,

my class will ultimately sustain great exclusion from the workforce.  Equities tip in favor of the injunction and society as excluding someone who doesn't have a traditional home or internet to work in your business, assuming other qualifications are met, cannot lead to healthy diversity in the workplace, an abundantly strong workforce, or compliance with America's growing disability legislation.

### E.  A TRO is Needed to Prevent Sunrun's Further Disclosure in Violation of the HIPAA 42 U.S.C. § 1320d-6

**The U.S. CFR 29 §1630.14(b)(1)** provides that "...information obtained regarding the medical condition or history of the applicant ... is treated as a confidential medical record..."  This CFR does provide exception, see **§1630.14(c)(1)(i),** which Sunrun did not qualify for in this circumstance, providing that "...supervisors and managers may be informed regarding necessary restrictions on the work or duties of the employee and necessary accommodations;".  While a sales manager *may* have benefited from knowing about my accommodation, which mine did when the accommodation was approved, there was no lawful cause for HR to disclose my condition or accommodation to Eshelle Young, simply because I reported legal violations.  I have also, the right to know if Ms. Young further spread this information to Ms. O'Quinn or other Sunrun employees, prior to Ms. O'Quinn's threats to constructively terminate me.

Evidence will prove that the alleged act occurred, and so I have a high likelihood of success on the merits of my claims. It is contrary to public interest for an employer to disclose private medical information, outside of a course and scope of employment calling for such disclosure.  The balance of equities tips in favor of the injunction and society, as it is well established that such protection from disclosures, has been passed and enforced by our government with great cause no longer requiring debate.

`

1

2

### F.  The Harm to be Sustained Should a TRO Not Be Granted Is Certainly Imminent and Irreparable

3

4

This circumstance certainly meets the threshold requirement for the likelihood of harm, on all five causes of action.

5

6

7

8

9

10

"It is well established that the deprivation of constitutional rights `unquestionably constitutes irreparable injury.'" *Melendres v. Arpaio,* **695 F.3d 990, 1002 (9th Cir. 2012).**  Here, Sunrun has and seeks to continue, to deprive me and my peers of our rights to reasonable accommodation through the ADA, our right to protection of private medical data, and our protections against discrimination by disparate impact.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

The harm to be sustained by myself and others is incredible, should Sunrun continue to falsely induce American talent through fraudulent means.  "Economic injury alone cannot support a finding of irreparable harm, but intangible injuries such as damage to reputation can." *See Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.,* **944 F.2d 597, 603 (9th Cir. 1991).**  Notably, there appears to be no differentiation between 'damage to reputation' and 'damaged to career path', save perhaps in a defamation claim, or other narrower circumstances.  Both are intimately intertwined, if not in most cases, one and the same.   The harm sustained by the fraudulent inducement and breach, and which will continue to be sustained in the absence of injunctive relief, is ongoing false claims made by Sunrun, to induce employment, relocation, or ongoing employment, and the resulting injury.  *See https://www.nytimes.com/2010/02/28/realestate/28cov.html* quoting a Manhatten psychoanalyst, Ronnie Green; "It's a matrix of safety, so moving is incredibly stressful and people don't realize it — they mainly talk about the packing and the external part of moving."  Notably, I've lived in a home full-time from birth, until June of 2019.

27

28

The harm to be sustained by myself and others is incredible, should Sunrun continue to cause its workers to defraud the American people through its distribution of multi-decade financial contracts.  Sunrun's consultants are required to secure HIS licenses for the State of California, as well as to be bound by the code constructed in the SEIA.  Our activities are governed by those documents.   By instructing us to cause harm unknowingly to the public, Sunrun creates incredible risk of litigation, loss of license, and chosen professions, with every signed contract.

The harm to be sustained by myself and the public is incredible should Sunrun continue to exclude and mistreat workers, based on a bona fide disabled status, or factors more prevalent in the community of those suffering from certain disabilities. Oddly, hotels will suffer if they are unable to provide corporate housing to individuals based on the 'no hotel internet' policy, and 'no employment without a house or apartment' policy, and the real estate industry would of course suffer as a whole, likely on an inclining scale with the changes to America's real estate and transportation industry as they appear to be moving currently.

The disparate impact that would be sustained by myself and my peers is well established.  It would specifically exclude those suffering from my conditions and as a biproduct, have a lifestyle more suitable for life "not in an apartment or house" and receiving "internet from a non-apartment or house."  The harm that has and will be sustained, is clearly irreparable, and in alignment with the logic of the courts surrounding constitutionality and irreparable harm.

The harm sustained and to be sustained by Sunrun's past and ongoing violation of my rights to privacy through the ADA are also irreparable, relying on the same reasoning of constitutionality.

### G. No Bond Should be Required

Federal Rule of Civil Procedure (c) vests the district court with

discretion as to whether to require a bond, and if so, the amount of the bond required, if any. See *Jorgansen v. Cassiday, 320 F.3d 906, 919 (9th Cir. 2003)*. The district court may dispense with the filing of a bond (id.; see also *Gorbach v. Reno***, 219 F.3d 1087 (9th Cir. 2000**)) and a strong likelihood of success on the merits may also favor "a minimal bond or no bond at all." See *California v. Tahoe Regional Planning Agency***, 766 F.2d 1319, 1326 (9th Cir. 1985).**  The requested relief will cause no damage to Sunrun since it should not be violating any of the laws alleged, or instructing its agents to do so, and should serve only to maintain the status quo.

## CONCLUSION

For the foregoing reasons, a TRO should be granted to protect my HIPAA rights and injunctive relief to protect myself, and the public from the remaining ongoing alleged causes of action.  I respectfully request that the court grant the relief requested by this application in its entirety and set a preliminary injunction hearing.


Dated:  March 22nd, 2020


_____                                    March 22nd, 2020

Daniel T. Doria                                                               DATED